IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ILER GROUP INC.<br>d/b/a FLEETISTICS,<br><br>          Plaintiff,<br><br>     v.<br><br>DISCRETE WIRELESS, INC.<br>d/b/a NEXTRAQ,<br><br>          Defendant. | No.1:14-CV-00447-SCJ |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

The claims asserted against NexTraq in this action are baseless and, as shown on the face of the First Amended Complaint, either untimely or implausible on their face. Fleetistics' efforts to rehabilitate these claims in opposition to NexTraq's motion to dismiss are unavailing, and the First Amended Complaint should be dismissed with prejudice.

**A.   The Dealer Agreement Is Governed by the UCC.**

Because the predominant purpose of the Dealer Agreement here was the sale of goods, Fleetistics' claim for breach of that agreement is governed by the four-year statute of limitations under Georgia's Uniform Commercial Code, O.C.G.A.

§ 11-2-725(1). Fleetistics raises three primary arguments to resist this conclusion: (1) that the goods sold under the Dealer Agreement "were merely incidental to the services provided" (Pl.'s Opp. Mot. Dismiss 3 (capitalization omitted))[1]; (2) that the real purpose of the Dealer Agreement was "to procure long-term service contracts for NexTraq" (*id.* at 5); and (3) that the Dealer Agreement's "commission structure" supports the previous two arguments (*id.* at 9). None of these arguments is persuasive.

### 1. Fleetistics' argument that goods were "incidental" to the Dealer Agreement is counterintuitive and contrary to settled law.

As explained in the initial memorandum of law supporting NexTraq's motion to dismiss, the Dealer Agreement contains numerous provisions describing the parties' rights and obligations with respect to the sale of NexTraq's Products, a reservation of rights "under the provisions of the Uniform Commercial Code," and a disclaimer of UCC-specific warranties for goods. (Def.'s Mem. Supp. Mot. Dismiss 8-9.)[2] Yet without addressing any of these provisions, Fleetistics asserts that the Products at the heart of the Dealer Agreement were "incidental" and that

---

[1] Citations in this form refer to Fleetistics' Memorandum of Law in Opposition to Defendant's Motion to Dismiss First Amended Complaint (ECF No. 20).

[2] Citations in this form refer to the Memorandum of Law in Support of Defendant's Motion to Dismiss First Amended Complaint (ECF No. 13-1).

sales were merely "ancillary" to the agreement's predominant purpose. (Pl.'s Opp. Mot. Dismiss 5.)

In making this assertion, Fleetistics overlooks large swaths of the Dealer Agreement and ignores the fact that "virtually every jurisdiction" — including Georgia and the Eleventh Circuit — has concluded that "a dealership agreement is predominantly for the sale of goods." *Am. Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1386 (7th Cir. 1995); *see also PCS Joint Venture, Ltd. v. Davis*, 219 Ga. App. 519, 520 (1995); *Intercorp, Inc. v. Pennzoil Co.*, 877 F.2d 1524, 1528 (11th Cir. 1989). Regardless of NexTraq's provision of fleet-tracking services to its Customers (and the corresponding importance of Customer Service Orders), the thrust of the Dealer Agreement was to ensure that Fleetistics would buy, promote, and resell NexTraq's goods.

The cases that Fleetistics cites in arguing the contrary are so far removed from the context of a dealership arrangement that they are easily distinguished. In *McCombs v. Southern Regional Medical Center, Inc.*, 233 Ga. App. 676 (1998), the plaintiff tried to sue a hospital under the UCC simply because her surgery had involved the implantation of a medical device. And although an automobile dealer was the plaintiff in *Heart of Texas Dodge, Inc. v. Star Coach, LLC*, 255 Ga. App. 801 (2002), the contract at issue was an agreement to convert a standard

automobile into a "custom performance vehicle" — in other words, "to change or improve the item." *Id.* at 801, 803. Neither of these cases involved a dealer's agreement to buy and resell goods to third parties.

### 2. Fleetistics' argument about the "procurement" of Customers would improperly exclude nearly every dealership agreement from the scope of the UCC.

To avoid the conclusion that the predominant purpose of the Dealer Agreement was the purchase and sale of goods, Fleetistics characterizes its activities under the Dealer Agreement as the "procurement of customer contracts." (Pl.'s Opp. Mot. Dismiss 8.) But if this description could transform the Dealer Agreement into a service contract, nearly *any* dealership agreement could be recharacterized as a contract for the dealer's "service" in procuring customers to buy the underlying goods.

By so readily allowing dealership agreements to fall outside the UCC, Fleetistics' procurement argument runs afoul of the judicial consensus regarding dealership agreements as contracts for the sale of goods. Indeed, the UCC itself acknowledges that contracts for the sale of goods often require a distributor's "best efforts to promote their sale." O.C.G.A. § 11-2-306(2). And despite the arguably service-oriented character of this obligation, courts in disputes over the adequacy of a distributor's promotional efforts have held it "immediately apparent" that

4

contracts involving "the mixed sale of goods ([e.g.,] shutters) and services ([like] installation)" are subject to the UCC.  *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 113 P.3d 347, 358 (N.M. Ct. App. 2005); *see also Abex Corp./Jetway Div. v. Controlled Sys., Inc.*, No. 92-1368, 1993 U.S. App. LEXIS 321, at *18, *26 (4th Cir. Jan. 12, 1993) (unpublished) (applying the UCC to dispute involving distributor's alleged failure to use best efforts to market the manufacturer's products).

Fleetistics' emphasis on Section 2(e) of the Dealer Agreement (Pl.'s Opp. Mot. Dismiss 6-8), which required Fleetistics to obtain Service Orders for the Products that it sold to Customers, is therefore misplaced.  Regardless of whether Fleetistics could install new Products without a signed Service Order, it was free to purchase as many Products from NexTraq as it believed it could ultimately sell — subject to the requirement that it "use its best efforts to promote, market and sell the Products and Services and promote the goodwill of [NexTraq]."  (1st Am. Compl. Ex. A, Attachment (B); *see also id.* Ex. A §§ 2(c), 3(c)(i).)  Fleetistics' promotional sales activities and related efforts to procure Service Orders were thus entirely consistent with the UCC and the Dealer Agreement's predominant purpose for the sale of goods.

### 3. The structure of the former commission payments does not show that the Dealer Agreement was a service contract.

Fleetistics makes much of the fact that commission payments under the Dealer Agreement were related to Service Orders (between Customers and NexTraq) and "include[d] full consideration . . . for providing First Level Support." (Pl.'s Opp. Mot. Dismiss 9.)  Yet neither of these terms leads to Fleetistics' conclusion that the predominant purpose of the Dealer Agreement was the provision of services.

First, as noted above, the Dealer Agreement does not support Fleetistics' question-begging assumption that commissions arose from "the procurement of Service Orders, and not the sale of goods." (Pl.'s Opp. Mot. Dismiss 11.)  NexTraq agreed to pay commissions on the sale of certain Products, for a limited period of time, and in a manner tied to NexTraq's revenues.  (*See* Def.'s Mem. Supp. Mot. Dismiss 14; 1st Am. Compl. Ex. A, § 4.)  Fleetistics' effort to tie these commissions to its "procurement" activities is just another attempt to recast its promotional and sales activities as "services" that trump the predominant purpose of a dealership agreement, contrary to the judicial consensus discussed above.

Second, the fact that commissions under the Dealer Agreement "include[d] full consideration . . . for providing First Level Support" (1st Am. Compl. Ex. A, § 4(a)) does not mean that the commissions arose *solely* from that "service."

6

Contracts for the sale of goods, and dealership agreements in particular, often entail incidental services, and including compensation for those services in the sales commissions (presumably to avoid quantum meruit claims) does not change the Dealer Agreement's predominant purpose.  *Cf. Old Country Toyota Corp. v. Toyota Motor Distribs., Inc.*, 966 F. Supp. 167, 170 (E.D.N.Y. 1997) ("Though the service provisions [of a dealership agreement] are substantial, their overarching purpose is to protect the interests and secure and maintain the goodwill of the buying public.  Again, this is at bottom the language of sales." (internal quotation marks and citations omitted)).

Nor does the fact that Fleetistics could have earned certain fees for providing First Level Support on Products sold by other dealers (*see* Pl.'s Opp. Mot. Dismiss 11-12) change the Dealer Agreement's nature as a contract for the sale of goods. For one thing, these Support Fees (*see* 1st Am. Compl. Ex. A, § 4(b)) had nothing to do with the procurement services that Fleetistics contends were central to the Dealer Agreement.  More importantly, these fees are analogous to amounts that one car dealer might receive from the manufacturer for servicing a car purchased from another dealer.  Regardless of whether Fleetistics ever received additional Support Fees from NexTraq to ensure the availability of First Level Support and "maintain the goodwill of the buying public," *Old Country Toyota*, 966 F. Supp. at 170

(internal quotation marks and citations omitted), the fact remains that the Dealer Agreement is predominantly a contract for the sale of goods and hence governed by the UCC.

### B. Any Claim Arising from Unpaid Mobitex Commissions Accrued in 2008.

Under Georgia's UCC, which contains the same language that the Eleventh Circuit interpreted in *American Cyanamid Co. v. Mississippi Chemical Corp.*, 817 F.2d 91, 93-94 (11th Cir. 1987), Fleetistics' claim for breach of contract accrued in 2008, when NexTraq repudiated any ongoing obligation to pay Mobitex commissions and promptly stopped paying them. Fleetistics' responses to this authority are (1) that the Eleventh Circuit's rule conflicts with the approach taken by courts in other jurisdictions and (2) that Georgia courts have rejected the Eleventh Circuit's reasoning. Because both of these arguments should be rejected, Fleetistics' claim for breach of contract is barred by the UCC's four-year statute of limitations.

#### 1. The Court should follow the Eleventh Circuit's reasoning instead of the opinions of other courts.

Despite Fleetistics' urging that the Court disregard *American Cyanamid* (Pl.'s Opp. Mot. Dismiss 15-17), Fleetistics gives no reason why the Court should follow trial-court decisions from other jurisdictions instead of Eleventh Circuit

precedent. For example, when Fleetistics notes that certain courts in New York have refused to follow *American Cyanamid* even though "the relevant provisions of the UCC in New York and Georgia are the same" (*id*. at 16), it ignores the fact that the New Jersey UCC provisions interpreted in *American Cyanamid* are identical to the Georgia UCC provisions at issue here (*see* Def.'s Mem. Supp. Mot. Dismiss 17).

At most, Fleetistics has identified a split among courts on the effect of an anticipatory repudiation accompanied by an immediate breach. But to the extent that courts in other jurisdictions applying the law of other states have disagreed with the Eleventh Circuit's holding in *American Cyanamid*, this Court should follow the reasoning of the Eleventh Circuit and dismiss Fleetistics' claim.

### 2. Georgia law does not require the application of a rule contrary to the rule articulated by the Eleventh Circuit.

Fleetistics' argument that Georgia courts have rejected the *American Cyanamid* rule fares no better. None of the Georgia cases cited in Fleetistics' opposition to NexTraq's motion to dismiss involved an anticipatory repudiation of obligations under a contract governed by the UCC.[3]

---

[3] *SPS Industries, Inc. v. Atlantic Steel Co.*, 186 Ga. App. 94 (1988), which Fleetistics cites on page 18 of its opposition brief, did not involve questions under the statute of limitations, and the court declined to conclude that there had been a

9

In *Advance Tufting, Inc. v. Daneshyar*, 259 Ga. App. 415 (2003), for instance — the opinion that Fleetistics contends "would make the *American Cyanamid* Court's holding as applied to Georgia law clearly wrong" (Pl.'s Opp. Mot. Dismiss 22) — the Georgia Court of Appeals simply held, "No statement of intent not to perform of record, there is here no repudiation." *Advanced Tufting*, 259 Ga. App. at 419.[4] As a result, the Court of Appeals' passing remarks about when a claim *might* have accrued if there *had* been a repudiation were "not necessary to resolve the issue before the Court" and should be disregarded as dicta. *Zepp v. Brannen*, 283 Ga. 395, 397 (2008). Because "[d]icta is binding on neither the bench nor the bar," *Walker v. State*, 290 Ga. 696, 700 n.3 (2012), the stray comments in *Advanced Tufting* (which were based on non-Georgia, non-UCC law) should not trump the Eleventh Circuit's holding under the UCC in *American Cyanamid*.

Fleetistics' argument that "*American Cyanamid* is entirely inapplicable" because the Eleventh Circuit discussed New Jersey law (Pl.'s Opp. Mot. Dismiss 21) is also incorrect. For one thing, Georgia courts have specifically cited New

---

repudiation in the first place.

[4] As noted in NexTraq's initial memorandum of law, the holding in *Advanced Tufting* also turned on the fact that the alleged repudiation took place years *after* the issuance of the last invoice on which the plaintiff sued. (*See* Def.'s Mem. Supp. Mot. Dismiss 17 n.7.)

Jersey law in cases involving contracts for the sale of goods under the UCC. *See Franklin v. Augusta Dodge, Inc.*, 287 Ga. App. 818, 820 (2007) (quoting *Fablok Mills, Inc. v. Cocker Machine & Foundry Co.*, 310 A.2d 491, 494 (N.J. Super. Ct. App. Div. 1973)); *J. Lee Gregory, Inc. v. Scandinavian House, L.P.*, 209 Ga. App. 285, 288 (1993) (quoting *Meyers v. Henderson Constr. Co.*, 370 A.2d 547, 550 (N.J. Super. Ct. Law Div. 1977)).

More importantly, Fleetistics' argument that the UCC's provision on supplementary law, O.C.G.A. § 11-1-103, requires the application of state-specific repudiation rules (*see* Pl.'s Opp. Mot. Dismiss 17-18) threatens to replace the uniformity required by the UCC with accrual rules that vary by jurisdiction. Such a result would contravene the UCC's purposes to "simplify, clarify, and modernize the law governing commercial transactions" and to "make uniform the law among the various jurisdictions." O.C.G.A. §§ 11-1-102(2)(a), (c). The Court should therefore reject Fleetistics' argument and dismiss the claim for breach of contract.

**C.    Fleetistics' Conclusory Allegations Cannot Support a Claim Under the Uniform Deceptive Trade Practices Act.**

Fleetistics' half-hearted arguments in support of its UDTPA claim amount to all but a concession that this claim should be dismissed with prejudice.[5]

---

[5] As a practical matter, Fleetistics' failure to respond adequately to NexTraq's

11

With respect to its lack of standing, for instance, Fleetistics does not identify a specific threat of future harm or deny that its "allegations are in the past tense," *Vie v. Wachovia Bank, N.A.*, No. 1:11-CV-3620-RWS, 2012 U.S. Dist. LEXIS 48782, at *8-9 (N.D. Ga. Apr. 6, 2012).  Given the threadbare allegations in the First Amended Complaint, the hypothetical possibility of future communications between NexTraq and "Direct Bill customers" is not sufficient to support a claim for injunctive relief.

Nor does Fleetistics explain how any of the statements in the email attached to the First Amended Complaint could be actionably deceptive under the UDTPA. Instead of causing confusion about the source of goods or services, the statements in that email — as Fleetistics itself notes — "sho[w] that the customer was previously serviced by Fleetistics, not NexTraq."  (Pl.'s Opp. Mot. Dismiss 23.)

Finally, although Fleetistics admits that it failed to supplement its original Complaint in accordance with Federal Rule of Civil Procedure 15(d), it has declined to file the motion required by that rule before attempting to rely on events that occurred after the commencement of this action.  At any rate, as shown above,

---

arguments should be deemed an "abandonment of [any UDTPA] claims" under Local Rule 7.1.B.  *Adams v. Unum Life Ins. Co. of Am.*, 508 F. Supp. 2d 1302, 1318 (N.D. Ga. 2007); *see also Collier v. Clayton County Cmty. Serv. Bd.*, 236 F. Supp. 2d 1345, 1380 (N.D. Ga. 2002) ("Plaintiff does not dispute this argument and appears to have abandoned her FMLA claims.  Accordingly the Court GRANTS summary judgment to defendants on this claim, as well.").

supplementing the original Complaint with a new UDTPA claim would be futile, and if Fleetistics files such a motion, it should be denied.  *See, e.g.*, *King v. Talton*, No. 5:11-CV-387-CAR-CHW, 2011 U.S. Dist. LEXIS 121905 (M.D. Ga. Oct. 21, 2011) (dismissing complaint on ground that supplementation would be futile); *McGrotha v. Fed Ex Ground Package Sys., Inc.*, No. 5:05-CV-391 (CAR), 2007 U.S. Dist. LEXIS 18794 (M.D. Ga. Feb. 24, 2007) (denying motion to supplement on futility grounds).

## Conclusion

Fleetistics' claim for breach of contract is barred by the UCC's four-year statute of limitations, and its claim under the UDTPA is fatally flawed.  Fleetistics has thus failed to state a claim upon which relief can be granted, and the Court should grant NexTraq's motion to dismiss the First Amended Complaint.

This 16th day of May 2014.

                                              s/ Lee A. Peifer
Rocco E. Testani
Georgia Bar No. 702614
Lee A. Peifer
Georgia Bar No. 367028
Katherine M. Smallwood
Georgia Bar No. 698979
Sutherland Asbill & Brennan LLP
999 Peachtree Street, N.E., Suite 2300
Atlanta, Georgia 30309-3996
Telephone: (404) 853-8000
Fax: (404) 853-8806
rocco.testani@sutherland.com
lee.peifer@sutherland.com
katherine.smallwood@sutherland.com

Counsel for Defendant

## CERTIFICATE OF COMPLIANCE

I certify that this brief has been prepared with Times New Roman 14-point font, one of the font and point selections approved by the Court in LR 5.1C.

s/ Lee A. Peifer<br>
Lee A. Peifer

## CERTIFICATE OF SERVICE

I certify that on May 16, 2014, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will automatically send notification of this filing to the other filers in this action.

s/ Lee A. Peifer
Lee A. Peifer
